

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 23, 2019

**BY ECF**

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:    *United States v. Dwayne Norville*, 18 Cr. 339 (PAC)**

Dear Judge Crotty:

    The defendant in the above-captioned case is scheduled to be sentenced on September 26, 2019, at 10:30 a.m.  The Government respectfully submits this letter in connection with sentencing and in response to the defendant's submission, dated September 18, 2019 ("Def. Ltr.") (Dkt. No. 195).  For the reasons set forth below, the Court should impose a sentence within the Stipulated Guidelines Range of 33 to 41 months' imprisonment, to run consecutively to the state sentence the defendant is serving.

### I.    Offense Conduct

    Norville and his co-conspirators participated in a wide-ranging scheme (the "Fraud Scheme") that involved unlawfully obtaining personally identifiable information of other individuals (including names, addresses, phone numbers, email addresses, birthdates, Social Security numbers, bank account numbers, credit and debit card numbers, and cellphone service provider account numbers); impersonating those individuals in order to obtain unauthorized access to their bank, credit and debit card, and cellphone service provider accounts; using such access to, among other things, facilitate the fraudulent transfer of funds to other bank accounts controlled by members of the conspiracy and the unauthorized purchasing of merchandise and gift cards at retail stores.  In total, members of the conspiracy unlawfully obtained more than $3,500,000 and attempted to obtain a total of more than $6,000,000.

    To carry out the Fraud Scheme, members of the conspiracy obtained victims' personally identifiable information from various sources, including the dark web and commercial establishments at which members of the scheme worked.  For example, one of Norville's co-defendants, Jillian Walcott, stole victims' personally identifiable information from an urgent care walk-in medical clinic in Manhattan where she worked.  After obtaining a victim's personally identifiable information, conspirators typically manufactured fraudulent credit or debit cards

Rev. 07.20.2016

linked to victims' accounts at financial institutions in order to access those accounts to make fraudulent purchases or wire transfers.

In some cases, members of the conspiracy attempted to "port"[1] (i.e., transfer) a victim's telephone number to a cellphone controlled by a Fraud Scheme participant.  Once the victims' telephone numbers were "ported" to cellphones controlled by Fraud Scheme participants, the Fraud Scheme participants would place telephone calls from those cellphones (to which the recently ported numbers were assigned) to the victims' financial institutions.  In most cases, the relevant financial institution's telephone system automatically recognized the incoming telephone numbers as belonging to their account holders and, on that basis, required fewer pieces of identifying information to authenticate the identity of the callers.  The defendants and/or their co-conspirators answered the limited set of authentication questions posed by the financial institution's customer service representative and then requested that (a) funds be sent via wire transfer to various accounts with other financial institutions and/or (b) "replacement" credit cards be sent to an address not associated with the account holder.  In other cases, Fraud Scheme participants used the "ported" cellphones to approve fraudulent purchases when a victim's financial institution texted or called a victim's telephone number to verify the propriety of the fraudulent purchases.

Norville was core member of the Fraud Scheme, whose role included purchasing merchandise at retailers using fraudulent credit cards.  The following are some examples of Norville's participation in the Fraud Scheme:

- On March 20, 2017, at 3:32 p.m., co-defendant Jamal Simon, the leader of the Fraud Scheme, placed a call to Norville.  During that call, Simon stated, in part, that "the card's dead now" because "somebody called in and reported it stolen," but he explained that he was "gonna get it back, though," and that he was "going to send for the real piece."[2]

- On March 21, 2017, at 1:57 p.m. Simon placed a call to Norville.  Before the call connected, Simon stated to another individual that they have six cards.  During the call, Simon asked Norville whether "[b]oth of them went through."  Norville confirmed that "it went through."  Simon also asked Norville, "So, you don't got to pick the money up?"  Norville responded, "No, I'm good.  I'm good right now."

- On March 22, 2017, Simon was expecting a genuine replacement credit card for a victim's account to be delivered to co-defendant Darren Davidson's residence,

---

[1]  "Porting" refers to a formal technical process whereby an existing telephone number is reassigned to a different cellphone.  Initiating the porting process without authorization of the owner of the cellphone number is a critical aspect of the scheme described herein, because credit card issuers often contact their customers via the cellphone number on file when the issuer detects suspicious activity on a customer's account.  If a member of the scheme has control of the cellphone number, then that member can falsely confirm the propriety of fraudulent transactions.

[2]  In this context, "real piece" refers to a genuine replacement credit card.

because Simon had fraudulently induced the credit card company to send it to that address by impersonating the victim.  Davidson told Simon that Davidson expected the card to arrive via UPS at approximately 4:00 p.m.  At 4:06 p.m. on that date, Simon placed a call to co-defendant Darren Davidson.  During that call, Simon told Davidson that "me and [Norville] are in front of your crib[3] on the street." Davidson responded, "Alright, say nothing."

- On March 22, 2017, at 9:09 p.m., Norville placed a call to Simon.  Norville asked Simon, "that paper's in the armrest, right?"  Simon responded, "yeah, the armrest." Norville then stated, "this hundred looks fake, too, n----.  Who you got it from?" Simon replied, "[unintelligible] pull it out the bank."

- On March 23, 2017, at 3:17 p.m., Norville placed a call to Simon.  During that call, Norville told Simon, "I'm going to come get the bread from you."  Simon responded, "Yeah, hold on.  I'm about to meet Eddie and all.  I'm fixing shit up right now.  So when I'm done, I'm going to come meet you.  We got to go on the road, so Eddie [Davidson] is making the face for me right now and I'm going back to my crib right now to get some blanks and go meet him again.  So you want to meet me by his crib or you going to meet me over there?"  Norville replied, "alright, call me when you over there."  At 3:30 p.m., Simon placed a call to Davidson. During that call, Davidson stated, "I am printing that shit right now."  At 4:42 p.m., Simon placed a telephone call to Norville.  During that call, Simon stated, "I'm going to call you back.  I'm runnin' to [a wireless service provider] around the corner . . . I'm on my way there first to see how it goes."  Norville responded, "alright, cool, I'm call you in a second."

- On March 23, 2017, at 7:04 p.m. Simon placed a call to Norville.  Norville told Simon, "I'm gettin' ringed up right now."  At 7:11 p.m., Simon placed another call to Norville.  Simon asked Norville, "it declined, bro?"  Norville responded, "yeah." Surveillance video recordings from a retail store show that between approximately 7:00 p.m. and approximately 7:15 p.m., Norville was present at a checkout counter inside the store in Brooklyn, New York, attempting to make purchases of merchandise using a fraudulent credit card.

- On March 30, 2017, at 12:22 p.m., Simon placed a call to Norville.  During that call, Simon told Norville that he had a particular type of credit card "from Paris" and asked whether Norville had any "blanks."  Norville responded that he did have blanks, but not for that type of credit card.  At 3:43 p.m. Simon placed another telephone call to Norville.  During that call, Simon said he would send Norville "the shit" for Norville to put on a "piece," which referred to a counterfeit credit card.

---

[3] In this context, "crib" means apartment or house.

## II.      Procedural History

On May 14, 2018, Norville was charged in Indictment 18 Cr. 339 (PAC) (the "Indictment") with conspiracy to commit access device fraud, in violation of Title 18, United States Code, Section 1029(b)(2) (Count One); conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Two); and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A (Count Three).  (PSR ¶¶ 1-4.)  On July 29, 2019, Norville pled guilty to Count Two of the Indictment pursuant to a plea agreement.  (PSR ¶ 8.)  In the plea agreement, the parties stipulated that the offense level for Count Two is 16, that the defendant's Criminal History Category is IV, and that the Guidelines Range for Count Two is 33 to 41 months' imprisonment.  (PSR ¶ 8.)  The Probation Office reached the same conclusion with respect to the Guidelines calculation (PSR ¶ 109), and recommended that the Court impose a sentence of 33 months' imprisonment, to run concurrently with the state sentence the defendant is serving. (PSR at 22.)

On September 18, 2019, the defendant submitted a sentencing memorandum, in which he requested a below-Guidelines sentence of one year and one day of imprisonment, to run concurrently with the state sentence the defendant is serving, because of the defendant's "strong family ties" and "acceptance of responsibility."  (Def. Ltr. 1.)

## III.      Sentences Imposed on Co-Defendants

To assist the Court in assessing the relative culpability of the defendants, the Government provides the following chart of the defendants who have pled guilty in this case, listed approximately in their order of culpability (from most to least culpable):

| Defendant | Criminal History Category | Criminal Offenses | Mandatory Minimum (months) | Guidelines Range (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Jamal Simon | I | wire fraud conspiracy; aggravated identity theft; wrongfully obtaining individually identifiable health information | 24 | 121 to 155 | |
| Melvin Brown | IV | wire fraud conspiracy; aggravated identity theft | 24 | 65 to 75 | |

| Defendant | Criminal History Category | Criminal Offenses | Mandatory Minimum (months) | Guidelines Range (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Dawdu Marriott | III | wire fraud conspiracy; aggravated identity theft | 24 | 57 to 65 | |
| David Boyd | IV | wire fraud conspiracy; aggravated identity theft | 24 | 51 to 57 | 51 |
| Rashaun McKay | III | wire fraud conspiracy; aggravated identity theft | 24 | 51 to 57 | |
| **Dwayne Norville** | **IV** | **wire fraud conspiracy** | **0** | **33 to 41** | |
| Jillian Walcott | I | wire fraud conspiracy; wrongfully obtaining individually identifiable health information | 0 | 33 to 41 | |
| Megan Montoya | III | wire fraud conspiracy | 0 | 33 to 41 | |
| Darren Davidson | I | wire fraud conspiracy | 0 | 27 to 33 | |
| Yvette Lubrun | I | wire fraud conspiracy | 0 | 15 to 21 | Probation |

### IV.    Discussion

#### A.  Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. 220, 264 (2005).  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set

forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B.  A Guidelines Sentence Is Appropriate In This Case

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others who are similarly situated, to promote respect for the law, and to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a)(2)(A)-(C).  These considerations weigh in favor of a sentence within the Guidelines Range of 33 to 41 months' imprisonment, to be imposed consecutively to the defendant's state sentence for unrelated conduct.

*First*, a sentence within the Guidelines Range would appropriately reflect the nature and seriousness of the defendant's conduct.  The defendant played an important role in the Fraud Scheme, helping Simon create fraudulent credit cards and then using those credit cards to make or attempt to make fraudulent purchases of merchandise from retail stores that caused between $95,000 and $150,000 in losses to victims.  (PSR ¶ 46.)  Overall, the Fraud Scheme caused losses of more than $3.5 million to victims and attempted to scam millions more.

*Second*, a sentence within the Guidelines Range is necessary to promote respect for the law and to deter others who are similarly situated from participating in similar schemes.  Fraud schemes of this type are on the rise because the unscrupulous have found that identity theft is profitable and easy to implement and conceal from law enforcement.  Following the nominal investment in obtaining individually identifiable information and blank cards with magnetic strips, the crime carries no further financial cost, apart from the prospect of apprehension and criminal penalties. However, the likelihood of detection is substantially lower than many other theft offenses.  Victims often do not realize that have been victimized for some period and are not able to report the fraud until well after funds have been stolen from their accounts and they have been substantially harmed.  In addition, the investigation of cases such as these is extraordinarily resource-intensive for law enforcement, and requires a substantial investment of resources in order to reveal the activities of a scheme such as this and the identities of its members.  Substantial punishment is

required to counterbalance the general perception that this type of scheme carries low costs for perpetrators.

*Third*, a sentence within the Guidelines Range is needed to deter this defendant from committing additional crimes and to protect the public. The defendant's criminal history is lengthy, serious, and includes a troubling pattern of violence:

- In December 2015, a UPS driver reported a larceny in progress after observing the defendant steal a package from a victim's residence immediately after it was dropped off, and then get into a Mercedes-Benz. Officers responded and asked the defendant to open the door of the Mercedes-Benz so that they could speak with him. Instead, the defendant put the car in drive, accelerated quickly, and nearly hit a police officer who narrowly dodged the vehicle by jumping out of the way. Police officers gave chase with lights and sirens for several blocks before blocking in the defendant's Mercedes-Benz. When the officers approached the vehicle, the defendant against tried to maneuver the Mercedes-Benz around the police officers. Because the car's doors were locked and the defendant refused to unlock them, the officers had to use a baton to shatter one of the car's windows in order to apprehend the defendant. The UPS package, bearing a delivery label for the victim's residence, was recovered from the trunk of the Mercedes-Benz. In an apparent exercise of leniency, the defendant was sentenced to a conditional discharge. (PSR ¶¶ 69-70.)

- In March 2016, the defendant was arrested after he kicked a female victim's apartment door off its hinges, blocked the victim with his body from entering her own apartment, spit on the victim numerous times, and pulled her hair. In another apparent exercise of leniency, the defendant was sentenced to a conditional discharge. (PSR ¶¶ 71-72.)

- In November 2016, the defendant got into a car accident while driving under the influence of alcohol. When police officers responded to the scene, the defendant attempted to flee, elbowed one officer in the face, and punched another in the shoulder. Once the defendant was subdued, he was found to be in possession of a loaded Kel-Tec 9mm semi-automatic firearm. The defendant was sentenced to 16 months' to four years' imprisonment.[4] (PSR ¶¶ 79-80.)

- In March 2018, the defendant was arrested after he struck a victim in the face, causing bleeding and requiring medical treatment. In yet another apparent exercise of leniency, the defendant was sentenced to a conditional discharge. (PSR ¶¶ 81-82.)

---

[4] The PSR incorrectly states that the sentence imposed was 40 months' to four years' imprisonment. (*See* PSR ¶ 80.)

The defendant's pattern of violent criminal conduct over the past five years is alarming. The defendant was shown unwarranted leniency on several occasions and squandered second and third chances by reoffending shortly after each conviction. None of those experiences with the criminal justice system appear to have had any deterrent effect on the defendant at all. The Court should sentence the defendant to a term of imprisonment within the Guidelines Range to ensure that the defendant is adequately deterred and to protect the public from his crimes for a meaningful period.

The Court should reject the defendant's request for a sentence of a below-Guidelines sentence of one year and one day of imprisonment. Such an extraordinarily lenient sentence is not called for by the facts of this case, it would fail to recognize the seriousness and dangerousness of the conduct at issue, and it would not send the appropriate message to the defendant or the public. It would, most importantly, fail completely to take into account the defendant's prior "multiple arrests and convictions." (PSR at 23.) It is particularly troubling that the defendant has been shown leniency on several previous occasions, and has nevertheless persisted in committing crimes, many of which have been violent in nature. Clearly, the defendant's prior convictions have not dissuaded him from continuing to commit crimes or served as a needed wake-up call. The Government certainly hopes that the defendant "understands the seriousness of his conduct" and has a "strong sense of post-offense rehabilitation." (Def. Ltr. 2.). However, the defendant's track record to date does not give confidence that this is likely to be the case. He has been given numerous chances by state judges and has wasted each of them; he hardly is deserving of this Court giving him "a chance." (Def. Ltr. 2.) A sentence of imprisonment within the Guidelines Range is necessary and appropriate to address this defendant's history and likely future.

In addition, a sentence of one year and one day of imprisonment would create an unwarranted sentencing disparity with the sentence imposed by this Court upon co-defendant David Boyd. As set forth above, Boyd's Guidelines Range was 51 to 57 months' imprisonment. This Court sentenced Boyd to 51 months' imprisonment. Boyd has a more senior role in the Fraud Scheme, which explains the difference in the defendant's Guidelines range (33 to 41 months) from Boyd's. But both Boyd and the defendant are in Criminal History Category IV, and both had displayed some violence in the past. This Court determined that no variance was warranted in Boyd's circumstances, and there similarly is no reason for a variance in this case. A sentence of imprisonment within the Guidelines Range is necessary and appropriate to avoid an unwarranted sentencing disparity with co-defendant Boyd.

The Court should also reject the defendant's request and the Probation Office's recommendation that the defendant's sentence of imprisonment be imposed to run concurrently with the defendant's current state sentence; instead, the Court should impose the sentence of imprisonment in this case to run consecutively to the defendant's state sentence. *See* U.S.S.G. § 5G1.3(d) ("the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense"). As described above, the defendant's serious criminal conduct that led to the state sentence is entirely separate—different conduct, different time period, and different type of offense. The defendant should not get a windfall in essentially avoiding a prison term for serious a serious federal crime because he happened to commit other, serious state crimes several months later. Neither the defendant nor the Probation Office offers

any persuasive reason for the Court to proceed otherwise, and the defendant should bear the full cost of his actions.

In sum, a sentence within the Guidelines Range, imposed to run consecutively to the defendant's state sentence, adequately would balance the various considerations under § 3553(a) and achieve the statute's stated objectives.

## V.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Guidelines Range of 33 to 41 months' imprisonment, to run consecutively to the defendant's state sentence, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:     *Robert B. Sobelman*
Nicholas W. Chiuchiolo
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-1247/2616

Cc:  Mitchell C. Elman, Esq. (by ECF)